IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-

UNITED STATES OF AMERICA,

    Plaintiff,

        v.

EONNUTRA, LLC, CDSM, LLC, and HABW,
LLC, corporations, and MICHAEL FLOREN, an
individual,

    Defendants.

## COMPLAINT

Plaintiff, the United States of America, by its undersigned counsel, and on behalf of the United States Food and Drug Administration ("FDA"), respectfully represents to this Court as follows:

### SUMMARY OF THE ACTION

1. This statutory injunction proceeding is brought under the Federal Food, Drug, and Cosmetic Act (the "Act"), 21 U.S.C. § 332(a), and the inherent equitable authority of this Court, to permanently enjoin EonNutra, LLC, CDSM, LLC, and HABW, LLC, corporations, and Michael Floren, an individual, (collectively, "Defendants") from:

    A. Violating 21 U.S.C. § 331(a), by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (dietary supplements) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1) or misbranded within the meaning of 21 U.S.C. § 343;

  B. Violating 21 U.S.C. § 331(k), by causing articles of food (dietary supplements) that Defendants hold for sale after shipment in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(g)(1) or misbranded within the meaning of 21 U.S.C. § 343;

  C. Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of drug that are misbranded within the meaning of 21 U.S.C. § 352;

  D. Violating 21 U.S.C. § 331(k) by causing articles of drug that Defendants hold for sale after shipment in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352; and

  E. Violating 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a), nor exempt from approval pursuant to 21 U.S.C. § 355(i).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter and all parties to this action under 28 U.S.C. §§ 1331, 1337, and 1345, and 21 U.S.C. § 332(a).

3. Venue in this district is proper under 28 U.S.C. §§ 1391(b) and (c).

## DEFENDANTS

4. Defendant EonNutra, LLC is incorporated under the laws of the state of Colorado. EonNutra creates the formulas and labeling for approximately 150 different dietary supplements. EonNutra does business at 3506 N. El Paso Street, Suite ½, Colorado Springs, Colorado (the "Facility"), within the jurisdiction of this court.

5. Defendant CDSM, LLC is incorporated under the laws of the state of Colorado. CDSM manufactures all of EonNutra's products, and manufactures dietary supplements for other companies as a contract manufacturer. CDSM does business at the same location as EonNutra.

6. Defendant HABW, LLC is incorporated under the laws of the state of Colorado. HABW is responsible for the sales, marketing, and distribution of EonNutra's products. HABW does business at the same location as EonNutra.

7. Michael Floren is the sole owner and management member of EonNutra, CDSM, and HABW, and is the most responsible person at each firm. He has ultimate authority over all of the firms' operations, including product formulation, manufacturing, labeling, and sales. He employs a total of approximately four employees. He also owns and control numerous websites on which Defendants' products are sold including, but not limited to, www.sotosupplements.com, www.deerantlermax.com, www.warhorselabs.com, www.primalragenutrition.com, and www.dnnutrition.com. Defendant Floren performs his duties at the EonNutra location.

8. Defendants have been and are now engaged in the business of manufacturing and distributing:

A. Dietary supplements within the meaning of the Act, which defines "dietary supplement" as "a product (other than tobacco) intended to supplement the diet" that contains one or more of the following dietary ingredients: a vitamin; a mineral; an herb or other botanical; an amino acid; a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or a concentrate, metabolite, constituent, extract or combination of any of them, and that "is labeled as a dietary supplement" and "is not represented for use as a conventional food or as a sole item of a meal or the diet." 21 U.S.C. § 321(ff). (Except for

3

purposes of 21 U.S.C. §§ 321(g) and 350f, dietary supplements are deemed to be food under the Act. 21 U.S.C. § 321(ff)); and

   B. Products that meet the definition of drug under the Act, 21 U.S.C. § 321(g)(1), because Defendants' claims establish that the products are intended to cure, mitigate, treat, or prevent disease and/or affect the structure or function of the body.

 9. Defendants' receive raw materials that they use to manufacture their products from outside the state of Colorado, including from China, Illinois, and California. Defendants distribute their products to customers throughout the United States, including in California, South Carolina, and Wisconsin.

## DEFENDANTS' VIOLATIONS OF THE ACT

### *Adulterated Dietary Supplements*

 10. The Act deems a dietary supplement to be adulterated if it is not prepared, packed, and held in conformance with regulations for current good manufacturing practice for dietary supplements ("Dietary Supplement CGMP"). 21 U.S.C. § 342(g)(1). The Dietary Supplement CGMP regulations, set forth at 21 C.F.R. Part 111, are designed to ensure the quality of dietary supplements. These regulations apply to any person who manufactures, packages, labels, or (subject to an exception not relevant here) holds dietary supplements.

 11. FDA investigators inspected Defendants' Facility between January and February, 2016 (the "2016 inspection"). The 2016 inspection established that the dietary supplements Defendants distribute are adulterated within the meaning of 21 U.S.C. § 342(g)(1), in that they are prepared, packed, or held in a manner that does not conform to Dietary Supplement CGMP regulations. FDA investigators documented significant deviations from Dietary Supplement CGMP regulations, including but not limited to:

A. Failure to establish specifications for the identity, purity, strength, and composition of the finished batch of dietary supplements, as required by 21 C.F.R. § 111.70(e), and failure to verify that these product specifications have been met, as required by 21 C.F.R. § 111.75(c);

B. Failure to ensure that tests or examinations used to determine whether specifications are met are appropriate, scientifically valid methods, as required by 21 C.F.R. § 111.75(h);

C. Failure to establish the identity specification for each component used in the manufacture of a dietary supplement, as required by 21 C.F.R. § 111.70(b)(1), and failure to verify that these specifications have been met, as required by 21 C.F.R. § 111.75(a)(1)(i);

D. Failure to establish component specifications that are necessary to ensure that the specifications for the purity, strength, and composition of dietary supplements manufactured using the components are met, as required by 21 C.F.R. § 111.70(b)(2);

E. Failure to qualify a supplier of a component by establishing the reliability of the supplier's certificates of analysis through confirmation of results of the supplier's tests or examinations, as required by 21 C.F.R. § 111.75(a)(2)(ii)(A);

F. Failure to prepare and follow a written master manufacturing record ("MMR") for each unique formulation and batch size of dietary supplement manufactured, as required by 21 C.F.R. § 111.205(a);

G. Failure of MMRs to include all required elements, as required by 21 C.F.R. § 111.210;

H. Failure of batch production records to include all required elements, as required by 21 C.F.R. §§ 111.255(b), 111.260;

      I.    Failure of the quality control personnel to ensure that Defendants' operations ensure the quality of the dietary supplement, as required by 21 C.F.R. §§ 111.105, 111.120(e);

      J.    Failure to collect and hold reserve samples of each lot of packaged and labeled dietary supplements that are distributed, as required by 21 C.F.R. § 111.83(a); and

      K.    Failure to make and keep records of product distribution, as required by 21 C.F.R. § 111.475(b)(2).

12.    Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce articles of food (dietary supplements) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1), in that they have been prepared, packed, or held under conditions that do not meet Dietary Supplement CGMP regulations, 21 C.F.R. Part 111.

13.    Defendants violate 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) that Defendants hold for sale after shipment in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(g)(1).

### *Misbranded Dietary Supplements*

14.    The Act deems a dietary supplement to be misbranded unless:

      A.    In the case of a dietary supplement that is fabricated from two or more ingredients, its label bears the common name or usual name of each ingredient, as required by 21 U.S.C. § 343(i)(2);

      B.    Its label or labeling bears nutrition information that provides the serving size in the manner required by 21 U.S.C. § 343(q)(1)(A), and the number of servings or other units of measure per container, as required by 21 U.S.C. § 343(q)(1)(B); and

   C. In the case of a dietary supplement that contains an herb or other botanical, its label or labeling identifies the part of the plant (e.g., root, leaves) from which the ingredient is derived, as required by 21 U.S.C. § 343(s)(2)(C).

15. Defendants' product labels cause many of their dietary supplements to be misbranded within the meaning of 21 U.S.C. § 343 as follows:

   A. The labels for A-D-T, Super Test, Alpha 14-Test, GH Mass Matrix, and Levo-5 GH Mass fail to list the capsule ingredients, as required by 21 U.S.C. § 343(i)(2) and 21 C.F.R. § 101.4(g);

   B. The labels for Pre-Workout Primal Rage, Growth Factor Complex 200, and HGH Night Time fail to list the correct serving size, as required by 21 U.S.C. § 343(q)(1)(A) and 21 C.F.R. §§ 101.9(b) and 101.12(b);

   C. The labels for Super Test, Growth Factor Complex 200, and HGH Night Time fail to list the number of servings per container or include this information as part of the net quantity of contents declaration, as required by 21 U.S.C. § 343(q)(1)(B) and 21 C.F.R. § 101.36(b)(1)(ii); and

   D. The labels for A-D-T, Super Test, Alpha-14 Test, Pre-Workout Primal Rage, Growth Factor Complex 200, GH Mass Matrix, Levo-5 GH Mass, and HGH Night Time fail to identify the part of the plant from which each botanical dietary ingredient in the product is derived, as required by 21 U.S.C. § 343(s)(2)(C) and 21 C.F.R. § 101.4(h)(1).

16. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction into interstate commerce articles of food (dietary supplements) that are misbranded within the meaning of 21 U.S.C. § 343.

17. Defendants violate 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) that Defendants hold for sale after shipment in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 343.

## *Unapproved New Drugs*

18. The Act's definition of drug includes products that are "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease." 21 U.S.C. § 321(g)(1)(B).

19. Because a product's intended use determines whether it is a drug, a product that falls within the Act's dietary supplement definition may also meet the Act's drug definition if it is intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease. *See* 21 U.S.C. § 321(ff).

20. Defendants cause certain of their products to be drugs under the Act because they make claims establishing that the products are intended to cure, mitigate, treat, or prevent diseases ("disease claims").

21. FDA reviewed Defendants' websites as recently as August 11, 2016, and identified the following claims (italicized below):

   A. 4NOx2: *"Nitric Oxide and Heart Disease . . . Nitric oxide has received the most medical attention due to its cardiovascular benefits . . . 4NOX2 helps your body increase nitric oxide production naturally instead of simply increasing nitric oxide levels through exterior sources like drugs."* [at www.sotosupplements.com];

   B. HGH Night Time, rHGH Drops Black Label, rHGH Spray Black Label, and Pink Label HGH Drops: *"This decrease in the levels of HGH is what may cause us to look old, have problems like diabetes, depression . . . [Product name] fights this decline in human growth hormone production in the body. . ."* [at www.sotosupplements.com];

      C.    10x IGF Extreme, HGH Booster, Pink Label Womens' Muscle Complex, Growth Factor Complex 200, and 5xIGF Extract: *"Injury recovery"* [at www.sotosupplements.com];

      D.    War Fighter Muscle Complex: *"Relieve joint and muscle pain . . . Many users of War Fighter Muscle Complex report that their joints are relieved from pain . . ."* [at www.warhorselabs.com];

      E.    Primal Rage Levo 5 GH Mass: *"Hesperidin is used to reduce blood pressure values and protect[] the heart from damage by increasing folate levels and reducing homeocysteine concentrations. It is also used to treat vascular disorders like hypertension, and to support capillary health and combat varicose veins."* [at www.primalragenutrition.com and www.dnnutrition.com]; and

      F.    Deer Antler Velvet Extract: *"Below is Web MD's review on the dietary ingredient Deer Antler Extract . . . Other uses include treatment of high cholesterol, high blood pressure, migraines, muscle aches and pains, asthma, indigestion, weak bones (osteoporosis), headache, liver and kidney disorders . . . soreness and weakness in the lower back and knees, chronic skin ulcers, and overactive bladder. . . . Some people use deer velvet to . . . improve fertility . . . and treat male sexual performance problems (erectile dysfunction, ED). Women use deer velvet to reduce the dose of estrogen they need in hormone replacement therapy. . . . In children, deer velvet is used as a tonic for children with 'failure to thrive," mental retardation . . . or bone problems including rickets."* [at www.deerantlermax.com].

22. The claims described in paragraph 21 above are disease claims and demonstrate that the products are intended to cure, mitigate, treat, and/or prevent disease; therefore, certain of Defendants' products are drugs within the meaning of the Act, 21 U.S.C. § 321(g)(1)(B).

9

23. A drug is a "new drug" if "the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1). For a product to be deemed "generally recognized as safe and effective" ("GRAS/E"), it must have substantial evidence of safety and effectiveness or, if it is an over-the-counter ("OTC") drug, it must comply with a monograph established by FDA regulation. *See* 21 U.S.C. § 355(d); 21 C.F.R. § 330.1.

24. Defendants' drugs listed in paragraph 21 above lack substantial evidence of safety and effectiveness. There are no published adequate and well-controlled investigations to show that these drugs are GRAS/E for any use and, therefore, qualified experts cannot come to a consensus of opinion concerning the effectiveness of these products.

25. FDA regulations contain OTC monographs that provide a mechanism for certain OTC drugs to be categorized as GRAS/E and thus exempt from the Act's definition of a new drug. *See* 21 C.F.R. § 330.1. An OTC product manufactured and labeled in accordance with an OTC monograph can be marketed without the submission and approval of a new drug application or an abbreviated new drug application. Any drug that does not strictly conform to each of the conditions contained in an applicable monograph, however, is subject to the new drug provisions of the Act.

26. Defendants' drugs listed in paragraph 21 above do not conform to any OTC monograph and, thus, are not GRAS/E by regulation.

27. Because Defendants' drugs are not GRAS/E, they are new drugs.

28. A drug that is a "new drug" within the meaning of the Act is prohibited from being introduced or delivered for introduction into interstate commerce unless FDA has approved a new drug application or abbreviated new drug application for that drug, or the drug is exempt from approval under an investigational new drug application. *See* 21 U.S.C. §§ 355(a), (b), (i), and (j).

29. FDA searched its records and found no new drug applications, abbreviated new drug applications, or investigational new drug applications for Defendants' new drugs listed in paragraph 21 above. Therefore, Defendants' products are unapproved new drugs within the meaning of the Act, 21 U.S.C. § 355(a).

30. Defendants violate 21 U.S.C. § 331(d) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i).

*Misbranded Drugs*

31. A drug is misbranded within the meaning of 21 U.S.C. § 352(f)(1) if its labeling fails to bear "adequate directions for use" and it does not fall within a regulatory exemption from that requirement. FDA has defined "adequate directions for use" as "directions under which the layman can use a drug safely and for the purpose for which it is intended." 21 C.F.R. § 201.5(a).

32. By definition, a drug that is also a prescription drug cannot have adequate instructions for lay use. 21 U.S.C. § 353(b)(1)(A) (requiring a drug to be dispensed by prescription that, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug").

33. Drugs that are unapproved are not exempt from the requirement for adequate directions for use. *See* 21 C.F.R. §§ 201.100(c)(2), 201.115.

34. It is not possible to write adequate directions for use for Defendants' drugs listed in paragraph 21 above because such directions -- including dosages, indications, contraindications, warnings, side effects, and necessary collateral measures -- are premised on animal and clinical data derived from extensive, scientifically controlled testing. As noted in paragraph 24 above, there are no well-controlled clinical test data for Defendants' drugs.

35. In addition, because of the purposes for which they are intended and/or the potential for serious adverse effects, many of Defendants' drugs are prescription drugs, which, as a matter of law, cannot meet the requirement for "adequate directions for use."

36. Certain of Defendants' drugs are misbranded within the meaning of 21 U.S.C. § 352(f)(1) because they fail to bear adequate directions for use. These drugs are not exempt from the requirement for adequate directions for use because they are unapproved. *See* 21 C.F.R. §§ 201.100(c)(2), 201.115.

37. Defendants violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of drug that are misbranded within the meaning of 21 U.S.C. § 352(f)(1).

38. Defendants violate 21 U.S.C. § 331(k) by causing articles of drug that Defendants hold for sale after shipment in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352(f)(1).

## DEFENDANTS' PREVIOUS VIOLATIONS

39. Defendants have previously violated the Act, as documented by FDA investigators during inspections of Defendants' Facility conducted in 2012, 2013, and 2015. During each of these prior inspections, FDA investigators:

    A.    Observed Dietary Supplement CGMP deviations that were the same or similar to the observations made during FDA's most recent inspection (described in paragraph 11 above). In fact, of the 19 observed Dietary Supplement CGMP deviations observed during FDA's 2016 inspection, 18 were also observed during the 2015 inspection;

    B.    Identified numerous claims on Defendants' websites that established that certain of their products were intended to be used to cure, mitigate, treat, or prevent diseases; and

    C.    Identified that Defendants' products labeling failed to comply with the labeling requirements for dietary supplements.

40. FDA has repeatedly warned Defendants about their ongoing violations. At the close of each of the four FDA inspections, FDA investigators issued a List of Inspectional Observations ("Form FDA-483") to, and discussed each of the observed Dietary Supplement CGMP deviations with, Defendant Floren. During each inspection, FDA investigators also spoke with Defendant Floren about the numerous claims on Defendants' websites that cause their products to be drugs within the meaning of the Act and the deficiencies with their products' labeling.

41. Representatives from FDA's Denver District Office met with Defendant Floren in March 2013. During this meeting, FDA discussed the Dietary Supplement CGMP deviations observed during FDA's 2012 inspection, Defendants' unapproved drug claims on their websites, and deficient labeling.

42. Defendant Floren has repeatedly promised to correct the Dietary Supplement CGMP deficiencies observed by FDA, to remove the disease claims from his websites, and to relabel products.

43. At the time of the most recent inspection, FDA documented that Defendants' websites contained many disease claims for certain of their products, causing them to be unapproved new drugs. Moreover, Defendants had not followed through on promises to correct their Dietary Supplement CGMP violations, as shown by the FDA investigators' observation and documentation of ongoing repeat CGMP deficiencies during the 2016 inspection. Defendants also had not revised their dietary supplement labels to comply with the Act and its implementing regulations.

44. Based on the foregoing, Plaintiff believes that, unless restrained by this Court, Defendants will continue to violate the Act in the manner set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

I. Order that Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, cease receiving, manufacturing, preparing, packing, repacking, labeling, holding, or distributing articles of dietary supplement and/or articles of drug, unless and until:

A. Defendants' facilities, methods, processes, and controls used to receive, manufacture, prepare, pack, repack, label, hold, and distribute dietary supplements are established, operated, and administered in conformity with Dietary Supplement CGMP and the Act, in a manner acceptable to FDA;

  B. Defendants' dietary supplement labeling complies with 21 U.S.C. § 343 and applicable regulations, in a manner acceptable to FDA; and

  C. Defendants' claims do not cause any dietary supplement that they receive, manufacture, prepare, pack, repack, label, hold, or distribute to be a drug within the meaning of the Act, 21 U.S.C. § 321(g)(1)(B), unless and until the product is the subject of an approved new drug application or abbreviated new drug application, or is exempt from approval under an investigational new drug application, 21 U.S.C. §§ 355(a), (b), (i), and (j).

II. Order that Defendants, and each and all of their directors, officers, agents, representatives, employees, attorneys, successors, and assigns, and any and all persons in active concert or participation with any of them, be permanently restrained and enjoined under 21 U.S.C. § 332(a) from directly or indirectly doing or causing to be done any of the following acts:

  A. Violating 21 U.S.C. § 331(a), by introducing or delivering for introduction, or causing to be introduced or delivered or introduction, into interstate commerce articles of food (including but not limited to dietary supplements and their components) that are adulterated within the meaning of 21 U.S.C. § 342(g)(1) or misbranded within the meaning of 21 U.S.C. § 343;

  B. Violating 21 U.S.C. § 331(k), by causing articles of food (including but not limited to dietary supplements and their components) that are held for sale after shipment in interstate commerce to become adulterated within the meaning of 21 U.S.C. § 342(g)(1) or misbranded within the meaning of 21 U.S.C. § 343;

  C. Violating 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of drug that are misbranded within the meaning of 21 U.S.C. § 352;

   D. Violating 21 U.S.C. § 331(k), by causing articles of drug that are held for sale after shipment in interstate commerce to become misbranded within the meaning of 21 U.S.C. § 352; and

   E. Violating 21 U.S.C. § 331(d), by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce new drugs, as defined by 21 U.S.C. § 321(p), that are neither approved pursuant to 21 U.S.C. § 355(a) nor exempt from approval pursuant to 21 U.S.C. § 355(i).

 III. Order that FDA be authorized pursuant to this injunction to inspect Defendants' place(s) of business and all records relating to the receipt, manufacture, preparing, packing, labeling, holding, and distribution of all of Defendants' products to ensure continuing compliance with the terms of the injunction, with the costs of such inspections to be borne by Defendants at the rates prevailing at the time the inspections are accomplished.

 IV. Order that Plaintiff be awarded costs incurred in pursuing this action and such other equitable relief as the Court deems just and proper.

Dated: March 10, 2017

              Respectfully submitted,

              ROBERT TROYER
              Acting United States Attorney

              JACOB LICHT-STEENFAT
              Assistant United States Attorney
              United States Attorney's Office
              1225 Seventeenth Street, Suite 700
              Denver, CO 80202
              Tel.: (303) 454-0308
              Jacob.Licht-Steenfat@usdoj.gov

CHAD A. READLER
Assistant United States Attorney
Civil Division
United States Department of Justice

MICHAEL S. BLUME
Director
Consumer Protection Branch

JILL FURMAN
Deputy Director
Consumer Protection Branch

/s/ Christopher M. O'Connell
CHRISTOPHER M. O'CONNELL
District of Columbia Bar No. 495495
Admitted *Pro Hac Vice* in U.S. District
Court for the District of Colorado
Trial Attorney
Consumer Protection Branch
United States Department of Justice
P.O. Box 386
Washington, DC 20044
Tel.: (202) 514-0515
Christopher.M.O'Connell@usdoj.gov

*OF COUNSEL:*

JEFFREY S. DAVIS
Acting General Counsel

ELIZABETH H. DICKINSON
Chief Counsel
Food and Drug Division

ANNAMARIE KEMPIC
Deputy Chief Counsel for Litigation

MICHELE SVONKIN
Senior Counsel
Office of the Chief Counsel
Food and Drug Administration
10903 New Hampshire Avenue
Bldg. 32, Room 4308
Silver Spring, MD 20993-0002
Tel.: (301) 796-8719

Michele.Svonkin@fda.hhs.gov

18